UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRAD JONES, | § § § | |
| *Plaintiff,* | § § | Civil Action No. 4:26-cv-1749 |
| v. | § § | |
| AMAZON.COM, INC., and AMAZON.COM SERVICES LLC, | § § § § | |
| *Defendants.* | § § § § | |

Plaintiff Brad Jones ("Plaintiff"), by his counsel, Harman Green LLC, alleges for his Complaint against Defendants Amazon.com, Inc and Amazon.com Services LLC ("Amazon" or "Defendants") as follows:

**PRELIMINARY STATEMENT**

1. This case is about egregious retaliation against an employee for relying on medical leave and for making complaints of race discrimination.

**JURISDICTION**

2. Pursuant to 28 U.S.C. §1331 this Court may properly hear Plaintiff's claims as they arise under a federal statute.

3. Pursuant to 28 U.S.C. §1367 this Court may properly hear Plaintiff's State law claims as they arise out of the same nucleus of operative fact so as to create the same case or controversy.

**PARTIES**

4. Plaintiff was and is a resident of Texas.

5. Defendant Amazon.com, Inc., has a principle place of business at 440 Terry Ave N, Seattle, WA 98109, and a registered agent, Corporation Service Company, at 300 Deschutes

1

Way Southwest, Tumwater, WA 98501.

6. Defendant Amazon.com Services, LLC is a wholly owned subsidiary of Defendant Amazon.com, Inc.

7. Defendant Amazon Services.com LLC has a principle place of business at 440 Terry Ave N, Seattle, WA 98109, and a registered agent, Corporation Service Company, at 300 Deschutes Way Southwest, Tumwater, WA 98501.

## JURY DEMAND

8. Plaintiff respectfully requests a trial by jury.

## STATEMENT OF FACTS

9. Plaintiff is a Black man who, until recently, was employed by Defendants.

10. Plaintiff performed work remotely for Defendants, and did not have a dedicated office in Texas.

11. Plaintiff was employed by Amazon from August 12, 2019, until Plaintiff's termination on September 4, 2025.

12. During Plaintiff's tenure, Plaintiff received multiple promotions and consistent strong performance feedback from leadership.

13. For a period, however, Plaintiff experienced race discrimination from his supervisor Kathryn Emtman.

14. Plaintiff first met Ms. Emtman in September 2019, and she became his supervisor in December 2021.

15. In their first meeting, Ms. Emtman suggested Plaintiff was not fit for the position despite having no prior experience with him.

16. Ms. Emtman asked "how is it that you came about this position," and when Plaintiff responded that a colleague had recommended him, Ms. Emtman responded, "that's not what I

heard," insinuating that Plaintiff was a "DEI hire."

17. Ms. Emtman repeatedly inhibited Plaintiff from receiving promotions.

18. Ms. Emtman repeatedly used the word "Brown bag lunch" despite specific directions from Amazon *not* to use that term as it has historic ties to racism and the "Brown Paper Bag Test" whereby Black and Brown people were excluded from spaces if their skin was 'more brown than a paper bag.'

19. Despite a clear mandate not to use that term, Ms. Emtman used it on multiple occasions.

20. For all of 2022, Ms. Emtman would tell Plaintiff that he was "not qualified" or otherwise belittled Plaintiff for no genuine or business purposes.

21. Plainitff was qualified, and Ms. Emtman merely wished to harm Plaintiff psychologically because she did not like him.

22. At the time, Plaintiff was the only Black Regional Construction Manager, and was the highest ranking Black employee on the team.

23. No white colleagues were treated in the negative manner Plaintiff was treated.

24. Ms. Emtman fabricated poor performance reviews for Plaintiff that were not fair or accurate.

25. In July 2023, Plaintiff filed a complaint of racial discrimination and harassment by Plaintiff's manager.

26. In July 2023 Plaintiff filed harassment and racial discrimination complaints against Plaintiff's then-manager, Ms. Emtman, with Amazon's Code of Ethics team.

27. Despite Plaintiff providing substantial evidence, Amazon's Ethics team initially dismissed Plaintiff's complaints, concluding that there were only "areas for improvement" pertaining to Emtman's actions rather than actual violations of company policy.

28. Plaintiff was later approved for a medical leave of absence, which Plaintiff began in November 2023.

29. Plaintiff only sought and went on this medical leave because of Defendants' failure to address the race discrimination he was experiencing.

30. Defendants' failure to properly address and prevent discrimination was emotionally and psychologically devastating and destructive, manifesting in physical ailments, and a need to leave the workplace for a short period.

31. During the summer of 2024, while still on medical leave of absence, several colleagues proactively informed Plaintiff of their direct knowledge of Emtman's misconduct, including her coercion of team members to provide false statements during the investigation that impacted the outcome of Plaintiff's original complaint.

32. Plaintiff initially hesitated to refile the complaint, given Plaintiff's strong skepticism about Amazon's investigative fairness.

33. Nonetheless, Plaintiff wanted Plaintiff's name and reputation cleared, as Plaintiff knew the facts and outcome of the 2023 complaint were erroneous.

34. However, on July 10, 2024, Fritz Gutenberg, a colleague, filed his own complaint against Emtman, confirming her unethical behavior and coercion of employees.

35. Seeing the similarities between Gutenberg's case and Plaintiff's own, Plaintiff decided to refile the complaint in August/September 2024.

36. Following Amazon's investigation based on Gutenberg's complaint, Amazon terminated Ms. Emtman for violating company policy, confirming Plaintiff's original allegations.

37. However, despite Amazon's confirmation that Ms. Emtman violated company policy in response to Gutenberg's complaint, Plaintiff received a contradictory decision on October 21, 2024, in which Plaintiff's refiled complaint was still dismissed, and Amazon's Ethics team

4

maintained that "no violation of company policy" was found in Plaintiff's case.

38. Despite the overwhelming overlap between the evidence presented in Gutenberg's complaint and Plaintiff's own, both cases yielded completely different outcomes, further reinforcing Plaintiff's belief that Plaintiff's case was handled with bias.

39. Plaintiff chose not to further challenge the Ethics team's inconsistent findings, as Plaintiff wanted to return to work, restore Plaintiff's reputation through performance, and avoid further involving peers in a prolonged dispute.

40. Notably, neither Plaintiff's manager nor the HR Business Partner ever reached out to discuss any "feedback" referenced in the October 21, 2024 HR Ethics team communication.

41. When Plaintiff returned from medical leave in December 2024, Amazon immediately subjected Plaintiff to retaliatory treatment.

42. This included stripping Plaintiff of Plaintiff's job title and job code; isolating Plaintiff from peers, excluding Plaintiff from meetings, and removing Plaintiff from normal team communications; reducing Plaintiff's compensation; and substantially decreasing Plaintiff's responsibilities and duties, leaving Plaintiff without meaningful work.

43. These actions were directly connected to Plaintiff's earlier protected complaints of discrimination and harassment.

44. After Plaintiff's approved medical leave of absence (LOA), protected by the ADA and FMLA from November 6, 2023, to December 5, 2024, Plaintiff returned to work on December 6, 2024.

45. Prior to Plaintiff's return, Plaintiff introduced himself via email to Plaintiff's new manager, Chris Ruest, and reminded him of Plaintiff's scheduled return.

46. Plaintiff's first and only scheduled one-on-one (1:1) meeting with Ruest occurred on December 9, 2024, from 12:30–1:00 PM CST.

47. Plaintiff's second and last conversation with Ruest occurred on January 28, 2025.

48. Over a 98-day period (December 6, 2024 – March 14, 2025), Ruest had only three brief internal Chime message exchanges with Plaintiff, in addition to these two conversations.

49. As part of Amazon's standard business practices for People Managers, it is an expected duty of Ruest's job title and job level to conduct weekly 1:1 meetings with all direct reports, as well as weekly team meetings.

50. These meetings are critical opportunities for direct reports to ask questions, seek guidance, and receive support.

51. By intentionally excluding Plaintiff from these essential meetings and denying Plaintiff access to the same resources provided to Plaintiff's peers, Plaintiff was immediately placed at a disadvantage, preventing Plaintiff from performing Plaintiff's job on equal footing.

52. Ruest's failure to hold 1:1 meetings with Plaintiff, while maintaining them with others, is a direct violation of his job responsibilities and constitutes clear retaliation, as there is no justifiable reason for such selective exclusion.

53. It was clear that Plaintiff was labeled a 'problem' because he complained of discrimination, and was being punished for his complaints.

54. Ruest knew or should have known that Plaintiff's medical leave of absence, and the medical conditions subject to the LOA, were protected activities.

55. Amazon and its HR team were provided routine medical records and diagnoses from Plaintiff's physicians during the entire pendency of the LOA.

56. During Plaintiff's December 9, 2024, introduction call, Plaintiff specifically asked Ruest which meetings Plaintiff should attend, including his weekly direct reports' calls.

57. Ruest falsely claimed that no such meeting existed, despite these calls occurring every Monday at 3:00 PM CST for all RCMs under his management.

58. Further evidence of intentional exclusion includes:

- Colleagues asked Ruest to add Plaintiff to meetings and communication chat rooms. He declined.

- A Construction Manager & Pre-Construction Manager Summit occurred in Austin, Texas (March 10–13, 2025). Of 50–60 required attendees, Plaintiff was the only direct report of Ruest listed as "optional," despite full-time employees, former employees, and third-party contractors being listed as required.

59. On March 14, 2025, Ruest notified Plaintiff via email of Plaintiff's job code/title change from Manager III (RCM) to Construction Manager III.

60. Plaintiff's job code/title change was only effectuated out of retaliation and because Plaintiff is disabled and took a medical leave.

61. In March 2025, Plaintiff filed another internal complaint, specifically raising concerns that Plaintiff was being retaliated against for Plaintiff's prior protected activity, complaints of race discrimination, and Plaintiff's use of medical leave.

62. Shortly after Plaintiff filed this complaint, Amazon placed Plaintiff on a Performance Improvement Plan (Pivot).

63. This action was unjustified, as Plaintiff had no significant responsibilities or performance issues since returning from leave, and Plaintiff's lower job title and reduced duties made any meaningful performance evaluation impossible.

64. Ruest admitted Plaintiff was ineligible for internal job transfers within Amazon due to placement on the Pivot Plan, further limiting his career progression.

65. Despite no prior discussions regarding this change, the demotion was immediate and without justification.

66. This was not a position elimination, but, rather, Plaintiff's position was simply

7

given to a colleague.

67. This demotion directly obstructed Plaintiff's professional advancement, forcing Plaintiff to work longer to regain Plaintiff's previous title (Manager III) rather than progressing toward Manager IV (Senior Regional Manager), as Plaintiff had been on track to do prior.

68. Two days before the demotion, the RCM who had taken over Plaintiff's region messaged and asked for Plaintiff's help with workload.

69. If Plaintiff's base salary was unchanged, the demotion and job code/title change had no legitimate purpose. The intent was clear: to hinder Plaintiff's career progression.

70. Project capacity is a predefined component of Amazon's Operations Plan of Record (POR), meaning it was entirely outside of Plaintiff's control, especially within the past 90 days. As such, the job title and duty change served no legitimate business purpose and appear solely intended to hinder Plaintiff's career progression.

71. For the prior 90 days, there had been no discussion of Plaintiff's job classification needing to change.

72. The suspicious timing evidences retaliation, demonstrating a causal connection between Plaintiff's protected activity and the adverse action.

73. As well, it is common knowledge that Amazon Pivot Plans are not meant to improve employee performance, but, rather, a means solely to generate a basis to terminate employees.

74. Evidencing this is that i) employees on Pivot Plans have low success rates maintaining employment and ii) Plaintiff's Pivot Plan came with a severance option as an alternative.

75. In fact, severance was the priority, as the Pivot Plan reiterates that possibility of "leaving Amazon" multiple times:

76.

**Improve at Amazon Plan**

| | |
|---|---|
| Employee: | Brad Jones |
| Employee Business Title: | Sr. Construction Manager |
| Employee Level: | 6 |
| Manager: | Chris Ruest cruest@ |
| Skip-level Manager: | Shelby Russell shelbyr@ |
| HRBP: | Hunter Phillips hunteph@ |
| Career Ambassador: | To be determined |
| Employee's Amazon Start Date: | August 12, 2019 |
| Improve Plan Start and End Date: | June 4, 2025 – July 3, 2025 |

**Pivot Options**

**1. Leave Amazon**
If you choose this option, you will be presented with a written agreement that sets out the terms of your separation from Amazon. If you sign this agreement, you will receive an estimated Pivot payment of 32,984.36 USD. This payment was calculated based on your tenure and base pay, and the amount is non-negotiable. You will be relieved of any repayment obligations related to bonus or relocation expenses. If your role is eligible for stock-based awards, any unvested stock-based awards will be cancelled upon completion of your employment.

**2. Improve at Amazon**
If you choose this option, you will remain in your current role and commit to demonstrating the required improvement in your performance by successfully completing the Improve Plan below. Your manager has outlined clear performance expectations for you to meet over the time period specified in your plan. Meeting these expectations will demonstrate that you are able to improve to the required standard. At the end of the Improve Plan, your manager will assess if you met these performance expectations. If you meet these expectations, you will be removed from Pivot. If you do not meet these expectations, you may choose to leave Amazon, or you may choose to appeal your manager's assessment of your performance against the expectations of the Improve Plan. If you choose to leave, you will be presented with a written agreement that sets out the terms of your separation from Amazon. If you sign this agreement, you will receive an estimated Pivot payment of 10,123.08 USD.

77. On April 17, 2025, Cassidy Ostmeyer, from Amazon Relations, a division within human resources, advised Plaintiff that the investigation was complete into Plaintiff's claims of retaliation and no further action would be taken.

78. Plaintiff's 2023 Pivot Plan was then abruptly revived and formally reissued in May 2025.

79. The Pivot Plan was vague, lacked objective criteria, and included daily tasks with unrealistic expectations (e.g., mandatory reports submitted within narrow time windows and full documentation of meetings).

80. During a call on May 27, 2025, HR explicitly stated that this was an "all-or-nothing" PIP—requiring a perfect score on every task to avoid failure.

81. This action was plainly retaliatory and pretextual.

82. On September 4, 2025, Amazon terminated Plaintiff's employment. Plaintiff

9

asserts that this termination was the result of unlawful retaliation for (1) Plaintiff's prior complaints of racial discrimination and harassment, and/or (2) Plaintiff's March 2025 complaint of retaliation following Plaintiff's medical leave.

# CAUSES OF ACTION
## FIRST CLAIM

**Race Discrimination under 42 U.S.C. 1981, Title VII, and the Washington Law Against Discrimination**

83. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 82 with the same force as though separately alleged herein.

84. Under 42 USC 1981, 42 USC 1981(a), and 42 USC 1981a, Americans are afforded the right to be free from discriminatory animus based on race.

85. Title VII tracks and minors 42 USC 1981, and expands protections based on race.

86. Under the Washington Law Against Discrimination, employees who are employed by covered employers, such as Defendants, are protected from discrimination.

87. Plaintiff is a Black man.

88. Plaintiff was targeted by his supervisors because of his race.

89. Plaintiff was subjected to listing to hostile commentary because of his race.

90. Plaintiff was terminated due to his race.

91. Plaintiff was demoted due to his race.

92. Plaintiff was prohibited from being promoted due to his race.

93. Plaintiff was treated less fairly and less well than white colleagues due to his race.

94. As such, Defendants intentionally and willfully violated Plaintiff's right to be free from discrimination, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

## SECOND CLAIM

**Retaliation under 42 U.S.C. 1981, Title VII, and the Washington Law Against Discrimination**

95. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 82 with the same force as though separately alleged herein.

96. Under 42 USC 1981, 42 USC 1981(a), and 42 USC 1981a, Americans are afforded the right to be free from discriminatory animus based on race. Likewise, they are afforded protection from retaliation when they complain about race discrimination.

97. Title VII tracks and minors 42 USC 1981, and expands protections based on race.

98. Under the Washington Law Against Discrimination, employees who are employed by covered employers, such as Defendants, are protected from discrimination and retaliation.

99. Plaintiff is a Black man.

100. Plaintiff was targeted by his supervisors because of his race.

101. Plaintiff was subjected to listing to hostile commentary because of his race.

102. Plaintiff was terminated due to his race.

103. Plaintiff was demoted due to his race.

104. Plaintiff was prohibited from being promoted due to his race.

105. Plaintiff was treated less fairly and less well than white colleagues due to his race.

106. Plaintiff explicitly complained about being treated differently based on race.

107. Plaintiff was then targeted and marginalized because of his complaints about race discrimination.

108. Plaintiff was terminated due to his complaints about race discrimination.

109. Plaintiff was demoted due to his complaints about race discrimination.

110. Plaintiff was prohibited from being promoted due to his complaints about race discrimination.

111. Plaintiff was treated less fairly and less well than white colleagues due to his complaints about race discrimination.

112. As such, Defendants intentionally and willfully violated Plaintiff's right to be free from retaliation, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages, attorney fees, costs, and expenses.

## THIRD CLAIM

**Disability discrimination in violation of the Americans with Disabilities Act and the Washington Law Against Discrimination**

113. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 82 with the same force as though separately alleged herein.

114. Under the Americans with Disabilities Act, employees who are employed by covered employers, such as Defendants, are protected from discrimination.

115. Under the Washington Law Against Discrimination, employees who are employed by covered employers, such as Defendants, are protected from discrimination.

116. Plaintiff is disabled.

117. Plaintiff made known to Defendant that he was disabled.

118. Plaintiff was demoted because he was and is disabled.

119. Plaintiff was subject to a hostile work environment and was belittled because he was and is disabled.

120. Plaintiff was terminated as a result of his disability.

121. The basis for Plaintiff's termination was pretextual, and only was fabricated to terminate him because he is disabled.

122. As such, Defendants intentionally and willfully violated Plaintiff's right to be

free from discrimination, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages as the failure to engage in the interactive process was malicious and inexcusable, attorney fees, costs, expenses, and any and all other remedies this Court deems just and proper.

## FOURTH CLAIM

**Retaliation for complaints of disability discrimination in violation of the Americans with Disabilities Act and the Washington Law Against Discrimination**

123.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 82 with the same force as though separately alleged herein.

124.    Under the Washington Law Against Discrimination, employees who are employed by covered employers, such as Defendants, are protected from discrimination and retaliation.

125.    Under the Americans with Disabilities Act, employees who are employed by covered employers, such as Defendants, are protected from discrimination and retaliation.

126.    Plaintiff is disabled.

127.    Plaintiff made known to Defendant that he was disabled.

128.    Defendants terminated Plaintiff because he complained about disability discrimination.

129.    As such, Defendants intentionally and willfully violated Plaintiff's right to be free from retaliation, and owes Plaintiff all front pay, back pay, emotional distress damages, punitive damages as the failure to engage in the interactive process was malicious and inexcusable, attorney fees, costs, expenses, and any and all other remedies this Court deems just and proper.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

B. For the second cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

C. For the third cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

D. For the fourth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements; and

E. For such other and further relief as the Court deems just and proper.

Dated:  Dallas, Texas
March 3, 2026

HARMAN GREEN LLC

By: _____
Evan Richardson
824 Exposition Ave.,
Suite 8
Dallas, Texas 75226
(646) 248-2288
wharman@theharmanfirm.com
erichardson@theharmanfirm.com
*Attorneys for Plaintiff*